IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| CHARLES A. FOLSOM, | |
|---|---|
| Plaintiff, | 4:17-CV-3143 |
| vs. | |
| UNITED STATES ARMY CORPS OF ENGINEERS NEBRASKA DISTRICT, et al., | MEMORANDUM AND ORDER |
| Defendants. | |

Charles Folsom, the plaintiff, has sued the U.S. Army Corps of Engineers and the Environmental Protection Agency (EPA) seeking to resolve a disagreement about Folsom's use of concrete to stabilize the bank of the Elkhorn River along property he owned. But as the defendants point out, while there was discussion among the parties about whether Folsom had violated § 404 of the Clean Water Act, 33 U.S.C. § 1344, there was no compliance order or other final agency action pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, actually imposing obligations or penalties on Folsom. As a result, Folsom has failed to state a claim for relief, and the Court will dismiss his complaint.

BACKGROUND

Folsom is the former owner[1] of land along the Elkhorn River in Dodge County, Nebraska. Filing 1 at 3. The river flooded in 2012, harming the

---

[1] Folsom has sold the property, but agreed to indemnify the buyers for costs resulting from his stabilization efforts. Filing 1 at 3. His standing to litigate with respect to the property has not been challenged, and the Court has no reason to question it at this point.

upstream drainage from Folsom's property. Filing 1 at 3. He did not apply for a permit for riverbank stabilization, believing it would have been futile. Filing 1 at 3. Instead, he simply put large pieces of recycled concrete on his property along the riverbank. Filing 1 at 4. He claims the materials "were [not] placed directly into the Elkhorn River or any jurisdictional wetlands." Filing 1 at 4.

The Corps disagreed, and on August 24, 2015, it sent him a letter setting forth its "preliminary assessment" that there had been an "unauthorized discharge of fill material into [the waters of the United States] . . . consisting of unauthorized size and material . . . placed using heavy equipment with tracks, such as a bull dozer." Filing 1-2 at 1. The Corps asserted that the "Elkhorn River and its adjacent wetlands are jurisdictional [waters of the United States]"[2] for purposes of the Clean Water Act, and that the fill Folsom placed had "impacted the stream and potential wetlands." Filing 1-2 at 1. Because Folsom had not obtained a permit, the Corps wrote, "the observed discharge is in violation of the Clean Water Act[.]" Filing 1-2 at 2. The letter set deadlines for Folsom to voluntarily remediate the alleged violation. Filing 1-2 at 2.

An amended letter, reflecting the Corps' site visit, was sent September 18, 2015. That letter was to the same effect, and likewise instructed Folsom that

> In some cases voluntary restoration may resolve a violation when the restoration of the [waters of the United States] eliminates current and future detrimental impacts to the satisfaction of the

---

[2] Generally, the Clean Water Act prohibits pollution into the "waters of the United States." 33 U.S.C. §§ 1311, 1344, & 1362(7).

district engineer. We believe that voluntary restoration is an appropriate resolution of this case. **In order to resolve this violation, without forwarding this violation to the U.S. Environmental Protection Agency (EPA) for resolution, a restoration plan detailing the voluntary restoration work to be completed must be received in this office for approval within 30 days of receipt of this letter.** Upon approval of the plan, the restoration work must be completed within 90 days, unless otherwise authorized. Failure to submit a plan and complete the restoration within the timeframe allowed will result in the case being forwarded to EPA for their enforcement.

Filing 1-3 at 2.

Folsom met with the Corps, but they were unable to resolve their disagreement. Filing 1-5 at 21. The Corps referred the matter to the EPA on October 15, 2015. Filing 1-5 at 22. On February 29, 2016, the EPA sent Folsom a letter stating that "actions are necessary to address the [Clean Water Act] compliance issues" the Corps had identified. Filing 1-4 at 1. The EPA enclosed a "proposed Administrative Order for Compliance on Consent to establish a schedule to accomplish these actions." Filing 1-4 at 1. "By this letter and through the proposed Order," Folsom was told, "the EPA invites you to discuss the activities necessary for the facility to comply with the [Clean Water Act]." Filing 1-4 at 1. The EPA also threatened an "enforcement action in the form of a civil penalty" of $91,500, "for settlement purposes only." Filing 1-4 at 1. But the penalties could be higher, the letter warned, "[s]hould the EPA decide to file an Administrative Complaint in this matter[.]" Filing 1-4 at 1.

> While the EPA believes it is appropriate to proceed with a formal compliance agreement and penalty action, we recognize that settlement of this matter may be best accomplished by conducting negotiations prior to formalizing any enforcement action. By this letter we are offering you the opportunity to negotiate the attached Administrative Order for Compliance on Consent and a resolution of the proposed penalty before a complaint is filed. As part of these pre-filing negotiations, the EPA will consider any additional information you may have that is relevant to the violations and the actions necessary to address the identified violations. If you are interested in participating in pre-filing negotiations, please contact . . . the attorney assigned to this matter, within **seven (7) calendar days** of your receipt of this letter . . . If the terms of the proposed Order and penalty are acceptable, you may also simply choose to sign the proposed Order and return it to the EPA for execution.
>
> If you choose not to sign the proposed Order or contact the EPA within the seven (7) day time period to participate in pre-filing negotiations regarding the Order, or if agreement is not reached within the **60-day pre-filing time period,** the EPA will evaluate other enforcement options to address the identified violations.

Filing 1-4 at 2. The proposed order included a direction to cease and desist placing concrete along the river, and would have required a plan for restoring the riverbank. Filing 1 at 4.

Folsom didn't hear anything more about it, though. Filing 1 at 5. So, on July 17, 2017, Folsom wrote the Corps explaining his actions and stating his "absolute intention to take this matter to court." Filing 1-5 at 4. The Corps responded with a letter dated August 28, advising Folsom that the Corps would not meet with him and had "no further action at this time" because "[his] enforcement case [had] been referred to the U.S. Environmental Protection Agency (EPA) Enforcement Program for review[.]" Filing 1-6.

So, Folsom filed this case. Filing 1. He asserts that the EPA's "proposed Compliance Order is a final agency action subject to judicial review" under the APA. Filing 1 at 6. He seeks an injunction against the Corps and EPA enjoining them "from enforcing the compliance order against Folsom[.]" Filing 1 at 6. And he seeks declaratory judgment regarding the defendants' alleged

> failure to comply with the [Clean Water Act], the APA, and the Constitution in determining that Folsom's actions were violative of the [Clean Water Act] and that he can be held liable for violation of the proposed Compliance Order, or the alleged underlying violation, without proof of a violation or an opportunity to be heard.

Filing 1 at 6. He is, he alleges, "presently and continuously injured by the proposed Compliance Order's issuance because its issuance and coincident threat of enforcement will force Folsom to restore his property to its original condition at great expense, or to subject himself to severe civil and criminal penalties." Filing 1 at 7. And, Folsom says, he wants to "maintain" and "finalize" his riverbank stabilization project. Filing 1 at 7.

The defendants move to dismiss Folsom's claims, arguing that there is no final agency action subject to judicial review. Filing 17.

## STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly,* 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Documents necessarily embraced by the pleadings include those whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

## DISCUSSION

The APA "evinces Congress' intention and understanding that judicial review should be widely available to challenge the actions of federal administrative officials." *Califano v. Sanders*, 430 U.S. 99, 104 (1977). So, the APA authorizes judicial review for "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. But, while a "final agency action" is not jurisdictional, the APA's requirements are part of the plaintiff's cause of action. *Iowa League of Cities v. EPA*, 711 F.3d 844, 863 n.12 (8th Cir. 2013); *see Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 n.3 (1991). And the Court's review is limited to the APA, because Folsom has directed the Court to no other statutory authorization providing for judicial review of the agency actions at issue. *See Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 813 (8th Cir. 2006). So, the initial question is whether a "final agency action" can be found here.

There are two conditions that generally must be satisfied for an agency's action to be "final" within the meaning of § 704: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations and citations omitted).

Folsom argues that test is met in this case, relying on two relatively recent Supreme Court opinions finding "final agency action" enforcing the Clean Water Act: *Sackett v. EPA*, 566 U.S. 120 (2012) and *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016). Those cases are, it turns out, more instructive by distinction than by analogy. But explaining why requires the Court to examine those decisions in some detail.

In *Sackett*, the plaintiff landowners received an "administrative compliance order" under § 309 of the Clean Water Act, 33 U.S.C. § 1319. 566 U.S. at 122. The Clean Water Act directs the EPA, when it determines that someone is polluting the waters of the United States, to either issue a compliance order or initiate a civil enforcement action. *Id.* at 123 (citing § 1319). A civil action provides for a substantial civil penalty—and that penalty is increased if levied against someone who defied a previous compliance order. *Id.*

The Supreme Court held that the compliance order was a final agency action within the meaning of § 704. The Court explained that "[b]y reason of the order, the [landowners] have the legal obligation to 'restore' their property according to an agency-approved Restoration Work Plan, and must give the EPA access to their property and to 'records and documentation related to the conditions at the Site.'" *Id.* at 126. Legal consequences also

There are two conditions that generally must be satisfied for an agency's action to be "final" within the meaning of § 704: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations and citations omitted).

Folsom argues that test is met in this case, relying on two relatively recent Supreme Court opinions finding "final agency action" enforcing the Clean Water Act: *Sackett v. EPA*, 566 U.S. 120 (2012) and *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016). Those cases are, it turns out, more instructive by distinction than by analogy. But explaining why requires the Court to examine those decisions in some detail.

In *Sackett*, the plaintiff landowners received an "administrative compliance order" under § 309 of the Clean Water Act, 33 U.S.C. § 1319. 566 U.S. at 122. The Clean Water Act directs the EPA, when it determines that someone is polluting the waters of the United States, to either issue a compliance order or initiate a civil enforcement action. *Id.* at 123 (citing § 1319). A civil action provides for a substantial civil penalty—and that penalty is increased if levied against someone who defied a previous compliance order. *Id.*

The Supreme Court held that the compliance order was a final agency action within the meaning of § 704. The Court explained that "[b]y reason of the order, the [landowners] have the legal obligation to 'restore' their property according to an agency-approved Restoration Work Plan, and must give the EPA access to their property and to 'records and documentation related to the conditions at the Site.'" *Id.* at 126. Legal consequences also

flowed from the order because it exposed the landowners to increased penalties in a subsequent civil enforcement proceeding. *Id.*

The Court also explained that the compliance order "mark[ed] the consummation of the agency's decisionmaking process." *Id.* at 127 (quotation omitted). The compliance order was not subject to further agency review: the EPA's invitation to "engage in informal discussion" regarding the order's requirements was, the Court held, not sufficient to make an otherwise final agency action non-final. *Id.* And the landowners were not required, the Court wrote, to incur additional liability by waiting for the EPA to bring a civil enforcement action. *Id.*

Later, in *Hawkes*, the Supreme Court reviewed a decision made by the Corps pursuant to a regulatory procedure which allows landowners to obtain a standalone "jurisdictional determination" about whether a particular property contains "waters of the United States." 136 S. Ct. at 1812. A "preliminary" jurisdictional determination simply advises a landowner that the property "may" contain waters of the United States; an "approved" jurisdictional determination definitively states whether or not waters of the United States are present. *Id.* (citing 33 C.F.R. §§ 320.1 & 331.2). And an "approved" jurisdictional determination is binding for 5 years on both the Corps and the EPA. *Id.*

The Court held that an "approved" jurisdictional determination is final agency action within the meaning of § 704. It marks the consummation of the Corps' decisionmaking process on the question. *Hawkes,* 136 S. Ct. at 1813. And it gives rise to legal consequences, the Court wrote, because a *negative* jurisdictional determination imposes a binding restraint on the Corps and the EPA, providing a 5-year "safe harbor" from enforcement—and a positive

jurisdictional determination, therefore, operates as a denial of the safe harbor that a negative jurisdictional determination affords. *Id.* at 1814.

Nor, the Court explained, is it an adequate alternative to judicial review for a landowner to simply dump fill material without a permit and risk an EPA enforcement action, or to apply for a permit despite the jurisdictional determination and appeal from the denial (if any) of that permit. *Id.* at 1815. "Parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and civil penalties." *Id.* (quotation omitted). Nor is applying for a permit an adequate alternative given the length, expense, and difficulty of the permit application process. *Id.*

Finally, the Court rejected the Corps' argument that seeking review of an enforcement action or a denied permit would be the only avenues for obtaining judicial review, had the Corps not adopted rules permitting a standalone jurisdictional determination. *Id.* at 1816. Significantly, however, the Court noted it was "[t]rue enough" that those would be the only reviewable decisions absent the standalone procedure—but, the Court concluded, "such a 'count your blessings' argument is not an adequate rejoinder to the assertion of a right to judicial review under the APA." *Id.*

Folsom argues that, like in *Sackett*, "the EPA has made a final determination that Folsom was in violation of the CWA and legal consequences will flow from an action by the EPA." Filing 20 at 11. But that's simply inaccurate, because the EPA has made no such final determination, and no legal consequences flow from the EPA's correspondence at all. The EPA has presented Folsom with a *proposed* compliance order—essentially, a settlement offer—and advised him that if he did not agree, the EPA would "evaluate other enforcement options." Filing 1-4 at 2. That's not final at all.

> The bite in the phrase "final action" . . . is not in the word "action," which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word "final," which requires that the action under review mark the consummation of the agency's decisionmaking process. Only if the EPA has rendered its last word on the matter in question is its action "final" and thus reviewable.

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001). Nothing about providing Folsom with a "proposed" compliance order—in effect, a proposed settlement and consent decree—suggests that the EPA has "rendered its last word on the matter in question." *See id*. An actual compliance order, duly entered, would be final. *See Sackett*, 566 U.S. 120. But the EPA hasn't entered one of those yet—a proposed compliance order is not the same as the real thing—and the EPA is clearly still in the pre-enforcement stage of the matter.

Folsom also argues that the Corps has made a "jurisdictional determination" akin to that in *Hawkes*: "[b]y forwarding Folsom's case on to the EPA for a [Clean Water Act] determination, the [Corps] has made a final determination and ended its role in actions against Folsom." Filing 20 at 8. The Corps has, Folsom contends, "subjected Folsom to an EPA determination that a [Clean Water Act] violation has occurred, imposing enormous civil and potential criminal penalties against him." Filing 20 at 8. Not so: even assuming that the Corps' decision to forward the matter to the EPA represented the consummation of the Corps' decisionmaking process, it imposed no legal obligations on Folsom beyond those already imposed by the Clean Water Act.

Folsom's argument "ignores the fact that the Court's holding in *Hawkes* turned on the [jurisdictional determination]'s ability to bind the agency for five years." *Kansas ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1033 (10th Cir. 2017). That "critical circumstance is absent from this case" because the Corps' referral to the EPA is "advisory and non-binding." *See id.*; *see also Marquette Cty. Road Comm'n v. EPA*, No. 2:15-cv-93, 2016 WL 7228156, at *3 (W.D. Mich. Dec. 14, 2016). The Court expressly recognized, in *Hawkes*, 136 S. Ct. at 1816, that the only final agency actions subject to judicial review would have been an enforcement action or permit denial, absent the special procedure for obtaining a "jurisdictional determination" that the Corps created—a procedure that Folsom did not avail himself of here.

In other words, in both *Sackett* and *Hawkes*, the agency's order was *itself* the source of legal obligations, "modifying the applicable legal landscape" by creating new obligations from which legal consequences flowed. *See Zinke*, 861 F.3d at 1034. But in this case, neither the Corps nor the EPA has imposed legal obligations on Folsom beyond those already imposed by the Clean Water Act and its implementing regulations.

The agency actions at issue in both *Sackett* and *Hawkes* are clearly, and meaningfully, distinguishable from this case. More analogous to this case is a "notice of violation" issued by the EPA pursuant to § 7413(a) of the Clean Air Act, 42 U.S.C. § 7413(a), as discussed by the Fifth Circuit in *Luminant Generation Co., LLC v. EPA*, 757 F.3d 439 (2014). In such notices, the EPA provides a "threshold allegation" of potential violations. *Id.* at 441-42.[3] The

---

[3] The Court recognizes that the notice issued in Clean Air Act cases is a specific statutory pre-enforcement requirement, *see* § 7413(a)(1), as opposed to the informal process at work in this case. But for purposes of distinguishing between pre-enforcement- and enforcement-

Fifth Circuit found that such a notice is not reviewable under § 704, explaining that a Clean Air Act notice is not "final" because

> issuing a notice does not commit the EPA to any particular course of action. The statute makes clear the intermediate, inconclusive nature of issuing a notice. After giving notice and waiting thirty days, the EPA *may* issue an order, issue an administrative penalty after a formal administrative hearing, or bring a civil action. Alternatively, the EPA could choose to withdraw or amend the notice or take no further action. Issuing notice, therefore, does not end the EPA's decisionmaking[.]

*Luminant*, 757 F.3d at 442. Nor does such a notice determine rights and obligations or impose legal consequences, because

> a notice does not itself determine [the noticee]'s rights or obligations, and no legal consequences flow from the issuance of the notice. The Clean Air Act and the [state implementation plan], not the notices, set forth [the noticee]'s rights and obligations. As to this litigation, adverse legal consequences will flow only if the district court determines that [the noticee] violated the Act or the [state implementation plan]. In other words, if the EPA issued notice and then took no further action, [the noticee] would have no new legal obligation imposed on it and would have lost no right it otherwise enjoyed.

stage proceedings, and assessing the finality of agency action, the statutory requirement is not significant, because the effect of the actions is the same.

*Id.* "Even if an agency gives notice . . . it need not seek a [compliance] order." *Id.* at 443. And "though violating a compliance order" like the one at issue in *Sackett* "may result in double penalties (for violating the Act and for violating the order), no authority suggests that a court may assess double penalties for 'violating' a notice. Therefore, despite the fact that orders may be final action, notices of violations do not share the finality of orders." *Id.* (footnote omitted). In sum, the Fifth Circuit concluded, "[a] notice of violation does not have the finality of the order in *Sackett*. Issuing a notice of violation does not create any legal obligation, alter any rights, or result in any legal consequences and does not mark the end of the EPA's decisionmaking process." *Id.* at 444; *see also Union Elec. Co. v. EPA,* 593 F.2d 299, 306 (8th Cir. 1979).

The same is true here. The EPA's letter and proposed compliance order do not "mark the consummation of the agency's decisionmaking process," *see Hawkes,* 136 S. Ct. at 1813, because the EPA has not even committed to an enforcement action, much less concluded such an action. Nor have the EPA or the Corps taken actions "by which rights or obligations have been determined, or from which legal consequences will flow," *see id.,* because neither agency has acted in a way that imposed new obligations on Folsom, or adjusted the legal relationship among the parties.

Accordingly, there is no "final agency action" reviewable under § 704, and Folsom's claims will be dismissed.

IT IS ORDERED:

1. The defendants' motion to dismiss (filing 17) is granted.

2. Folsom's complaint is dismissed.

3. A separate judgment will be entered.

Dated this 23rd day of April, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge